**Levin x4948**
*TLF 05/07/2024*

**EXHIBIT A**

**DECLARATION OF DAVID PANIWOZIK IN SUPPORT OF VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

I, David Paniwozik, a Special Agent with the Federal Bureau of Investigation ("FBI") being duly sworn, state the following:

**Introduction and Agent Background**

1. I am a Special Agent with the FBI and have been since March 2020. As part of my duties, I investigate violations of federal law, including cyber-crime cases, computer and network intrusions, ransomware, cyber stalking, and internet fraud. I have gained experience in conducting such investigations through training in seminars, classes, and everyday work related to conducting these types of investigations. I am currently assigned to the FBI Baltimore Cyber Task Force in Baltimore, Maryland. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

2. Prior to my employment as a Special Agent, I worked as a Forensic Accountant for the FBI in Chicago, Illinois from August 2017 to October 2019. During my time as a Forensic Accountant, I performed financial investigations, identified violations, and prepared legal exhibits. Further, I prepared and testified to exhibits as part of a federal trial.

**Purpose of This Declaration**

3. This declaration is submitted in support of a complaint for forfeiture *in rem* of cryptocurrency funds seized from the following Binance accounts (collectively, the "**TARGET ACCOUNTS**"):

- **TARGET ACCOUNT 1:**

- o *User ID*: XXXXX6389

- o *Associated Email Address*: siacallnet@hotmail.com

- o *Wallet*: 1P1KJ6e2ed5zYQS9BLNHXX7vLNTMJvtUuX

- **TARGET ACCOUNT 2**:

  - o *User ID*: XXXX3230

  - o *Associated Email Address*: ricku.ishu1990@gmail.com

  - o *Wallet*: 1Dq162zDwcHPi4iDAtgAqNizTC2ZaNZ25t

The investigation of—and subsequent seizure of funds from—the **TARGET ACCOUNTS** is described in more specific detail below.

4. The cryptocurrency amounts[1] seized from the **TARGET ACCOUNTS** on or about August 4, 2021 (the "Defendant Property") are summarized in the below table:

| TARGET ACCOUNT 1 | | |
|---|---|---|
| COIN | COIN NAME | QUANTITY |
| BTC | Bitcoin | 13.492 |
| DOGE | Dogecoin | 235,812.390 |
| ETC | Ethereum Classic | 394.340 |
| USDT | Tether | 113,090.609 |
| XRP | XRP | 65,546.165 |

| TARGET ACCOUNT 2 | | |
|---|---|---|
| COIN | COIN NAME | QUANTITY |
| BTC | Bitcoin | 0.070 |
| DOGE | Dogecoin | 309,236.273 |
| DOT | Polkadot | 97.514 |
| ETH | Ethereum | 21.378 |
| MATIC | Polygon | 24,664.751 |
| USDT | Tether | 250,668.378 |
| XLM | Stellar | 12,247.367 |
| XRP | XRP | 19,128.227 |

---

[1] Unless otherwise noted, all cryptocurrency amounts in this declaration are rounded to the nearest .001.

| YFI | Yearn.finance | 1.388 |
| TLM | Alien Worlds | 6,660.950 |
| SHIB | SHIB INU | 47,837,010.270 |

5.     I submit there are sufficient facts to support a reasonable belief the Defendant Property constitutes or is derived from proceeds obtained directly or indirectly as the result of computer fraud in violation of 18 U.S.C. § 1030(a)(4) and/or wire fraud in violation of 18 U.S.C. § 1343, and/or is property involved in money laundering in violation of 18 U.S.C. § 1956, and therefore is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), (a)(1)(C), and (a)(1)(D).

## Summary of the Investigation

A. Cryptocurrencies and Transaction Analysis

6.     Bitcoin (BTC) is a "cryptocurrency," also known as "virtual currency." Cryptocurrencies are not tied to any nation's fiat currency. The owner of cryptocurrency is assigned a mathematical encryption key pair, consisting of a "public key" and a "private key," with which to control the currency they own. The public key is also known as an "address," is visible to the public, and allows members of the public to verify the owner of virtual currency and other information. Addresses are also used to send and receive cryptocurrency. A "wallet" can hold multiple addresses for a user, and an "account" can hold multiple wallets for a user. The private key also known as a "secret key," is essentially a password used to execute cryptocurrency transactions. Secret keys are typically only shared with the owner of the address.

7.     "Ethereum" is a cryptocurrency, or virtual currency, that utilizes a blockchain-based software program. Ethereum is the world's second-largest cryptocurrency by market capitalization, behind Bitcoin.

3

8.      "TetherUS" (USDT), also referred to a "Tether", is a cryptocurrency purportedly backed by United States dollars. Tether was originally designed to always be worth $1, and the company responsible for issuing Tether purportedly maintained $1 in reserves for each Tether issued.

9.      Cryptocurrency transactions can have multiple inputs and multiple outputs. While the ownership of any particular address or wallet can be anonymous, all transactions of cryptocurrencies are recorded on a "blockchain," which is a series of "blocks" of transactions that establishes a verifiable, transparent record of the movement of virtual currency. Blockchains in this context are viewable by the public—they show all transactions, but do not reflect who owns a particular address. As cryptocurrency transactions are processed, they are assigned a unique identifier on the blockchain called a transaction hash.

10.     Cryptocurrency exchanges exist and operate similarly to fiat currency exchanges. Customers uses these exchanges to trade one form of digital currency for another, or to exchange digital currency into fiat money. Based on my training, knowledge, and experience, fraudsters often use cryptocurrency exchanges to launder or obfuscate their illicit gains.

11.     Binance Holdings Limited ("Binance") is a non-U.S. company registered in the Cayman Islands, which the U.S. Government has confirmed with Cayman authorities. Binance owns and operates Binance.com, a cryptocurrency exchange that provides a platform for trading various cryptocurrencies and exchanging cryptocurrencies for "fiat" (government-backed) currencies. Binance is one of the largest cryptocurrency exchanges in the world in terms of trading volume. Among other services, Binance provides customers with "custodial wallets," meaning that Binance maintains the private keys relating to the customer's cryptocurrency and therefore

4

has complete control over client funds. Binance is therefore able to seize and transfer customer funds pursuant to legal process and court orders.

12. Based on my training and experience, financial account information, including cryptocurrency wallets, is not typically shared across multiple, unrelated individuals. I know from my training and experience that this shared use of information is very often the same person or a close and trusted group working in concert.

13. Based on my training and experience, I know that individuals engaged in criminal activity involving cryptocurrency frequently engage in "chain hopping," meaning that they convert funds from one cryptocurrency to another, in order to obscure the source of funds and make it more difficult to track illicit funds as they move from one blockchain to another.

B. "Tech Support" Scams

14. In and around June and July 2021, The FBI investigated a technical-support scam involving elderly victims. Technical-support scams are perpetrated in several ways. In some instances, fraudsters make telephone calls and claim to be computer technicians associated with a well-known company. They will also use fake websites to generate internet pop-up messages that warn about non-existent computer problems. The messages will claim to have detected viruses or other malware on the victim's computer that was placed there by hackers and will instruct users to contact a phone number for a "support line."

15. When the victim calls the number provided, the fraudsters pretend to act as "tech support" and ask the victim to provide them with remote access to the victim's computer and/or phone. This is typically accomplished by having the victim download a remote access application, such as TeamViewer or UltraViewer, which allows the fraudsters to remotely access the victim's

devices and review the data contained therein, such as bank account numbers and other identifying information.

16. Once the fraudsters have access to the victim's computer, they will then act as if they are performing a diagnosis of the purported problem and will inform the victim that the victim's computer, and personally identifiable information stored on it, has been compromised. The fraudsters will then ask the victim which financial institutions the victim has accounts with. When the victim provides this information, the fraudsters advise that these accounts may have been compromised, and the victim will need to work with a bank representative to "clean" the accounts. The "tech support" fraudster transfers the victim to another fraudster, who will claim to be part of the "fraud department" at the victim's financial institution.

17. Following this transfer, the "fraud department" fraudster explains to the victim that the victim's bank account has been compromised. The fraudster then explains that, in order to "clean" the account, all of the funds must be transferred to a cryptocurrency exchange. The fraudster will set up or work with the victim to set up an account with the cryptocurrency exchange in the victim's name. The victim is then told to conduct wire transfers to the cryptocurrency account or, in some cases, to another bank account that is connected to a cryptocurrency exchange and that the fraudsters have created in the victim's name. The fraudsters ensure that the victim is always logged into a remote desktop software in order to monitor the activity and obtain verification codes.

18. Once the victim wires funds into the specified account(s), the fraudsters, without the victim's knowledge, transfer the money to wallets controlled entirely by the fraudsters. This process is repeated several times until the victim has no more funds to transfer. Once the funds have been exhausted, the fraudsters stop all communication with the victim.

C.  April 22, 2021: Victim A

19. The FBI is investigating a technical support fraud scam against "Victim A," an individual located in Chevy Chase, Maryland. On April 22, 2021, Victim A was conducting open-source research online as a part of Victim A's role as a research volunteer. At some point during this research, Victim A's laptop computer started making a loud noise that sounded like a fire alarm. Several pop-up windows began to appear on the screen. A message appeared that said something similar to "Your computer is frozen. You're being hacked. Call Microsoft at 702-447-8316." Victim A closed the screen to the laptop for several seconds, which stopped the noise. But upon opening the screen, the noise returned, and the pop-up windows remained. Victim A then contacted the number provided in the pop-up message.

20. Upon calling, an unknown male ("Fraudster 1") answered the phone by identifying himself as working for Microsoft and offered his assistance. Victim A explained the issue to Fraudster 1, who informed Victim A that Victim A's computer had been compromised by "Russian and Chinese hackers." Fraudster 1 then asked Victim A what bank Victim A used, as those accounts could also be compromised. Victim A told Fraudster 1 what bank Victim A used. Fraudster 1 then told Victim A he was transferring Victim A to a "representative in the fraud department" at Victim A's bank. Victim A then spoke to an unknown male claiming to be in the fraud department at Victim A's Bank ("Fraudster 2").

21. Fraudster 2 stated that Victim A's bank account had been compromised and that there were five pending charges. Victim A asked why the bank had not reached out. Fraudster 2 said the bank had reached out, and that Victim A had replied back with an email authorizing the transactions. Victim A was then led to believe that the hackers mirrored Victim A's email account and had been in communication with the bank while posing as Victim A.

22. Fraudster 2 then told Victim A that he needed to "clean" the bank account. According to Fraudster 2, this referred to transferring funds from the bank account to a cryptocurrency exchange in Victim A's name. Fraudster 2 explained that once Victim A's bank account was "cleaned," the funds would then be re-deposited there.

23. Fraudster 2 had Victim A download remote desktop software on Victim A's computer and phone. Fraudster 2 had Victim A launch the software on both devices and provide him with the passphrase in order to log into the devices. During this time, Fraudster 2—or someone working with him—created a Coinbase account in Victim A's name ("Coinbase Dummy Account A"), and Fraudster 2 gave Victim A the password for Coinbase Dummy Account A.

24. Over the course of approximately five weeks, the fraudsters called Victim A around 9:00 a.m. EST every day, Monday through Friday. Victim A was instructed to launch the remote desktop software on both the phone and the desktop, provide the fraudsters with the passcodes, and leave the devices on and active all day, typically from approximately 9:00 a.m. to 6:00 p.m. EST. The fraudsters also instructed Victim A to leave the cellphone on speakerphone.

25. Each day, the fraudsters gave Victim A instructions to conduct financial transactions from Victim A's financial accounts. Over the course of the five weeks, Victim A wired approximately $661,000 to a Swan Bitcoin account created by the fraudsters in Victim A's name ("Swan Dummy Account A"). The fraudsters then transferred the funds from Swan Dummy Account A to Coinbase Dummy Account A. Over the course of the scheme, this resulted in the purchase of approximately 14.714 BTC.[2]

---

[2] At the time, in June 2021, 1 BTC was valued at around $37,000 USD.

26. The FBI obtained the transaction history of Coinbase Dummy Account A from Victim A. FBI analysis of the account identified the following five deposit transactions:

| DATE | AMOUNT | SOURCE | DESTINATION |
|---|---|---|---|
| 4/23/2021 | 0.478 BTC | Swan Dummy Account A | Coinbase Dummy Account A |
| 5/5/2021 | 2.608 BTC | Swan Dummy Account A | Coinbase Dummy Account A |
| 5/6/2021 | 1.494 BTC | Swan Dummy Account A | Coinbase Dummy Account A |
| 5/20/2021 | 4.766 BTC | Swan Dummy Account A | Coinbase Dummy Account A |
| 5/22/2021 | 5.368 BTC | Swan Dummy Account A | Coinbase Dummy Account A |
| **TOTAL** | **14.714 BTC** | | |

27. The investigation showed that once the deposits were received into Coinbase Dummy Account A, fraudsters immediately transferred the funds out of the account to separate wallets used by the fraudsters, but not controlled by Victim A. The funds from Coinbase Dummy Account A were transferred to the following five wallets:

| DATE | AMOUNT | SOURCE | DESTINATION |
|---|---|---|---|
| 4/23/2021 | 0.478 BTC | Coinbase Dummy Account A | "**Wallet 1**": 16zB5kE2nA8LWdXXycDjwBehXrBzgyH5j2 |
| 5/5/2021 | 2.608 BTC | Coinbase Dummy Account A | "**Wallet 2**": 1PmCwVytbQnji1YvCHS98sDRrCMmMFUd6H |
| 5/6/2021 | 1.494 BTC | Coinbase Dummy Account A | "**Wallet 3**": 19Wj3AYzio6AHDy4q6nWuwnQFwk8fFtPr |
| 5/20/2021 | 4.766 BTC | Coinbase Dummy Account A | "**Wallet 4**": 18rVdFjtBgt9BEBbUsqdVo4hrWbsxnzEjn |
| 5/22/2021 | 5.368 BTC | Coinbase Dummy Account A | "**Wallet 5**": 13rMwi2QisT7j3cwPbcS296u6aUdzE8TPe |

28. FBI conducted a tracing analysis on the withdrawal transactions. The tracing analysis of **Wallet 2** identified that it received only one deposit of 2.608 BTC, which came from

9

Coinbase Dummy Account. There were then two transfers out of **Wallet 2**, which brought its balance to zero. One transfer of 1.608 BTC went directly to an unattributed wallet.[3] A second transfer from **Wallet 2** of the remaining 1.00 BTC went directly to **TARGET ACCOUNT 1**. Investigators determined that **TARGET ACCOUNT 1** was held at Binance.

29. Investigators contacted Binance and requested records associated for **TARGET ACCOUNT 1**. In response, Binance produced account records for the user who owned that account, which included the following information:

| USER ID | 141506389 |
|---|---|
| NAME | Gaurav Verma |
| EMAIL | siacallnet@hotmail.com |
| MOBILE/SMS | +919292131313 |
| REGISTRATION TIME | 2021-05-04 15:15:00 |

30. As proof of identity, the user sent Binance an image of a passport apparently issued by the Republic of India in the name of Gaurav Verma that reflected a date of birth in October 1985. The user also sent an image purported to be a picture of himself in front of his computer. Usage data from Binance indicates that the user accessed the Binance account from India using an Android device.

31. The tracing analysis further showed that on June 12, 2021, Victim A's funds were transferred out of **Wallet 5**. **Wallet 5** received only one deposit of 5.368 BTC from the Coinbase Dummy Account. There were then two transfers out of **Wallet 5**, which brought its balance to zero. One transfer of 3.753 BTC went directly to **TARGET ACCOUNT 2**, which analysis determined was held at Binance. The other transfer of 1.615 BTC went to an unattributed wallet.

---

[3] Unattributed wallets are not tied to a registered cryptocurrency exchange that maintains customer information. The private keys for an unattributed wallet are held by the individual(s) that own the wallet.

32. The Binance records confirmed the deposit of 3.753 BTC to **TARGET ACCOUNT 2** from **Wallet 5** on June 12, 2021. The next day, June 13, 2021, the user of **TARGET ACCOUNT 2** converted the 3.753 BTC to Tether.

33. Records from Binance for **TARGET ACCOUNT 2** contained the following information:

| USER ID | 86793230 |
|---|---|
| NAME | Rakesh Matta |
| EMAIL | ricku.ishu1990@gmail.com |
| MOBILE/SMS | +919899118267 |
| REGISTRATION TIME | 2021-02-22 09:21:51 |

34. As proof of identity, the user sent Binance an image of a Government of India Unique Identification Card, or Aadhaar Card, in the name of Rakesh Matta that showed a year of birth of 1990. The user also included a photograph purported to be a picture of himself.

D. <u>June 5, 2021: Victim B</u>

35. The FBI also investigated a technical fraud scam against "Victim B," an individual located in Libertyville, Illinois. The pattern of this fraud followed the same basic pattern as the fraudulent scheme employed against Victim A.

36. On June 5, 2021, Victim B was searching the internet for an owner's manual of a product. When attempting to open the document, a broadcast came over Victim B's computer stating that Victim B's computer had been compromised and hacked. A pop-up message appeared that instructed Victim B to contact Microsoft at 628-203-3908.

37. Victim B called the number and spoke to an unknown male who identified himself as working at Microsoft ("Fraudster 3").[4] Fraudster 3 claimed that Victim B's computer had been compromised by hackers in China, Russia, and Canada. Fraudster 3 then told Victim B that Victim B's bank accounts had likely been compromised. Fraudster 3 asked Victim B to provide the name of Victim B's bank, and once Victim B complied, Fraudster 3 stated that he was transferring Victim B to a representative in the fraud department at Victim B's bank. Fraudster 3 said he needed to transfer Victim B through a "secured line" because the hackers were listening through Victim B's computer and phone.

38. Upon transferring, another unknown male ("Fraudster 4") answered and identified himself as working in the "complaints department" at Victim B's bank. Fraudster 4 claimed that Victim B's accounts had been compromised. Victim B was then told to download and install remote desktop software. Fraudster 4 told Victim B to launch the software and provide him with the password to access the computer. Once Victim B had done so, Fraudster 4 told Victim B that he would call Victim B the next morning. Victim B was told to leave Victim B's computer on and not turn it off.

39. The following day, Victim B received a call from Fraudster 4. Fraudster 4 told Victim B that due to the "compromise," he needed to create a "dummy" account for Victim B. Fraudster 4 stated that the account would be used to transfer and convert Victim B's funds into Bitcoin to keep the funds secure and encrypted.

---

[4] The unknown males who spoke with all the victims may have been the same two men that spoke with Victim A (Fraudsters 1 and 2). However, due to the lack of certainty as to how many individuals are involved in the fraudulent schemes, this declaration refers to the specific men that spoke with each victim as unique individuals.

40. Fraudster 4 logged into Victim B's bank account using the remote access software. Fraudster 4 told Victim B that he needed to consolidate Victim B's funds into one account. He transferred all of Victim B's money into Victim B's savings account and left a portion in Victim B's checking account to cover expenses. With access to Victim B's email and bank account, the unknown male created and verified a Coinbase account in the name of Victim B ("Coinbase Dummy Account B"). Victim B was then provided with information for a Swan Bitcoin account the fraudsters had created in Victim B's name ("Swan Dummy Account B") that was tied to a cryptocurrency exchange. Fraudster 4 told Victim B to drive to Victim B's bank and make a wire transfer of approximately $57,000 to Swan Dummy Account B. The funds were then converted into Bitcoin and sent to Coinbase Dummy Account B.

41. Coinbase provided information regarding Coinbase Dummy Account B. Analysis of the account identified a deposit of 1.65 BTC on June 7, 2021. Approximately 25 minutes later, the 1.65 BTC was transferred out of the account and sent to **TARGET ACCOUNT 1**. Records from Binance confirmed the receipt of the funds from Victim B into **TARGET ACCOUNT 1**.

E. March 5, 2021: Victim C

42. The FBI also investigated a technical support fraud scam against "Victim C," an individual located in Eliot, Maine. The pattern of this fraud followed the same basic pattern as the fraudulent scheme employed against Victims A and B.

43. On March 5, 2021, Victim C was searching the internet and received an alert that Victim C's computer had been compromised. A pop-up message appeared instructing Victim C to contact Microsoft at 888-390-4190.

44. Victim C called the number and spoke to an unknown female who identified herself as working at Microsoft ("Fraudster 5"). Fraudster 5 informed Victim C that Victim C's computer

had been accessed by five scammers who compromised all of Victim C's data. Fraudster 5 then asked Victim C to provide the name of Victim C's bank. After Victim C provided that information, Fraudster 5 stated she was transferring Victim C to a representative in that bank's fraud department. Fraudster 5 told Victim C that she needed to transfer Victim C through a "secured line" because of the compromise.

45. Once transferred, an unknown male ("Fraudster 6") answered and identified himself as working in the "fraud department" at Victim C's bank. Fraudster 6 informed Victim C that Victim C's accounts had been compromised. Fraudster 6 instructed Victim C to download and install remote desktop software onto Victim C's computer and phone. Victim C was told that the software was needed because the process of recovering the bank accounts would require granting Microsoft and the bank access Victim C's computer in order scan and clean the accounts. Fraudster 6 also informed Victim C that he would need to create a "dummy" account to secure the funds in Victim C's bank.

46. Over the course of 17 weeks, Victim C would call or receive a call from the fraudsters every day of the week. Each day, fraudsters instructed Victim C to launch the remote desktop software on Victim C's phone and computer, provide the passcodes, and leave the devices on and active all day. The fraudsters also requested that Victim C check in approximately every twenty minutes.

47. After instructing Victim C to conduct an initial set of wire transfers,[5] the fraudsters used the remote access software to confirm and verify the bank accounts in Victim C's name.

---

[5] Before following the previously observed pattern of using "Swan Dummy" and "Coinbase Dummy" accounts, the fraudsters instructed Victim C to conduct wire transfers to a foreign bank account. In total, Victim C transferred approximately $150,000 to a foreign bank account, at which point Victim C's bank refused to allow further similar wire transfers.

Victim C was then provided with instructions to conduct transactions from Victim C's financial accounts. Over the course of approximately 15 weeks, Victim C wired approximately $450,000 to a bank account provided by the fraudsters that was tied to a Swan Bitcoin account created by the fraudsters in Victim C's name ("Swan Dummy Account C"). The fraudsters then transferred the funds to a Coinbase account they had created in Victim C's name ("Coinbase Dummy Account C"). Those transfers ultimately resulted in the purchase of approximately 10.286 BTC, valued at approximately $499,367 as of August 4, 2021.

48. Coinbase records contained the following information regarding the account created in the name of Victim C. Analysis of the account identified the following four deposits from Swam Dummy Account C to Coinbase Dummy Account C:

| DATE | AMOUNT | SOURCE | DESTINATION |
|---|---|---|---|
| 4/14/2021 | 0.797 BTC | Swan Dummy Account C | Coinbase Dummy Account C |
| 4/21/2021 | 2.704 BTC | Swan Dummy Account C | Coinbase Dummy Account C |
| 5/17/2021 | 2.290 BTC | Swan Dummy Account C | Coinbase Dummy Account C |
| 6/2/2021 | 4.495 BTC | Swan Dummy Account C | Coinbase Dummy Account C |
| TOTAL | 10.286 BTC | | |

49. Once the deposits arrived in Coinbase Dummy Account C, the fraudsters immediately transferred funds out of the account. Victim C's funds were sent to the following four wallets:

| DATE | AMOUNT | SOURCE | DESTINATION |
|---|---|---|---|
| 4/14/2021 | 0.797 BTC | Coinbase Dummy Account C | **"Wallet 6"**: 15RUqPBbhpyjZcNtwhnmUPQzsoV5cf34Qd |
| 4/21/2021 | 2.704 BTC | Coinbase Dummy Account C | **"Wallet 7"**: 1D8mz1keJKuX7192o8uRqdKfUsCmGKDaVo |

| 5/17/2021 | 2.290 BTC | Coinbase Dummy Account C | **TARGET ACCOUNT 1** |
|---|---|---|---|
| 6/3/2021 | 4.495 BTC | Coinbase Dummy Account C | "**Wallet 8**": 1JJ9w4Zhqxgh8YzFf9b4FLWoXZ6GeXStvd |

50. As set forth above, on May 17, 2021, the fraudsters transferred approximately 2.290 BTC directly to **TARGET ACCOUNT 1** from Coinbase Dummy Account C.

51. As set forth above, on April 21, 2021, the fraudsters transferred approximately 2.704 BTC from Coinbase Dummy Account C to **Wallet 7**. Those were the only funds ever deposited in **Wallet 7**. On April 30, 2021, two transfers were made out of **Wallet 7**: The first transfer was of 1.000 BTC directly to **TARGET ACCOUNT 2**. The remaining 1.704 BTC was transferred to an unattributed wallet.

F. Seizures of Funds in the TARGET ACCOUNTS

52. On June 30, 2021, the Honorable Thomas M. DiGirolamo, United States Magistrate Judge for the District of Maryland, issued a warrant authorizing the seizure of funds from **TARGET ACCOUNT 1** and **TARGET ACCOUNT 2**. The FBI served Binance with the seizure warrant shortly thereafter, and the contents of **TARGET ACCOUNT 1** and **TARGET ACCOUNT 2** were transferred into FBI custody on or about August 4, 2021.

## CONCLUSION

53. Based on the forgoing, I submit that there is probable cause to believe that all of the funds held in the **TARGET ACCOUNTS**, in any form, are proceeds of, or traceable to proceeds of violations of, inter alia, 18 U.S.C. §§ 1030(a)(4) (Unauthorized Access to a Protected Computer in Furtherance of Fraud) and 1343 (Wire Fraud), and/or are involved in violations of,

inter alia, 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering), and therefore subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), (a)(1)(C), and (a)(1)(D).

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 7th day of May, 2024.

David Paniwozik
Special Agent
Federal Bureau of Investigation